**Edward B. BROOKS, Jr., et al.,**
**Plaintiffs-Appellants,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 84–1107.

United States Court of Appeals,
Fifth Circuit.

April 19, 1985.

James A. Rolfe, U.S. Atty., Dallas, Tex., Barbara B. O'Malley, Sp. Litigation Counsel, Dept. of Justice, Washington, D.C., for defendant-appellee.

Strasburger & Price, P. Michael Jung, H. Norman Kinzy, Dallas, Tex., for plaintiffs-appellants.

Before JOHNSON, and HILL, Circuit Judges, and HINOJOSA,[*] District Judge.

JOHNSON, Circuit Judge:

This action under the Federal Tort Claims Act, which is on its second appeal to this Court, arises out of an airplane accident in which there was no personal injury. On January 14, 1977, a plane flown by one of the plaintiffs,[1] Edward B. Brooks, Jr., landed at the Calhoun County Airport (CCA) in Port Lavaca, Texas. As the plane

reached the second half of the runway, the plane encountered a part of the runway which had been torn up by construction work. As a result, the nose wheel of the plane collapsed and the airplane was badly damaged. On the original trial of this matter, the district court found that the total damage suffered by the plaintiffs was $214,528, and, pursuant to the Texas comparative negligence statute,[2] apportioned the negligence seventy-five percent to the Government and twenty-five percent to the plaintiffs. On appeal of that first judgment, this Court affirmed in part, reversed in part, and remanded. On remand, the district court found that the United States was sixty percent at fault and attributed forty percent fault to the plaintiffs.[3] On this second appeal, we affirm the district court's judgment both on the merits and on the interest rate applied to the judgment.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts

The facts of this case are set forth in this Court's original opinion, *Brooks v. United States*, 695 F.2d 984 (5th Cir.1983). These facts will be summarized here.

On January 10, 1977, construction on the far half of Runway 32, the major runway at the Calhoun County Airport, began. On the same day, an official at the airport called the Federal Aviation Administration (FAA) to request that the FAA issue a Notice to Airmen (NOTAM) to warn that the runway would be closed until further notice. The NOTAM was properly filed and therefore appeared in summary form as a part of the hourly sequences on the FAA teletype.

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[1] Plaintiffs include the pilot and lessee of the aircraft, Edward B. Brooks, Jr.; the owner and lessor of the aircraft, Republic National Leasing Corporation; and the insurers of the aircraft, United States Fire Insurance Company and International Aviation Underwriters, Inc.

[2] Under the Federal Tort Claims Act, this suit is governed by Texas law on the issue of liability. 28 U.S.C. § 1346(b).

[3] As discussed below, the United States was alleged to be liable for the negligence of employees of the Federal Aviation Administration.

On the day before the crash, Brooks, the pilot, telephoned the flight service station in Dallas to obtain weather information for the next day for his destination, the Calhoun County Airport. During this conversation, the flight service specialist reported to Brooks the general weather outlook. Although the NOTAM containing the warning regarding the runway condition at the Calhoun County Airport was available, the flight service specialist did not relay the notice. Testimony at trial indicated that relaying the warning would have been the better practice. The flight service specialist did not give Brooks the current weather sequences, which would have contained the NOTAM report of the construction at the Calhoun County Airport, because the specialist felt that Brooks was calling too far ahead of his planned flight time for Brooks to rely on the information. The flight service specialist assumed Brooks would call again shortly before the time of his flight in order to get current weather information and, with that weather information, the NOTAM. Brooks, however, did not call the Dallas flight service station again before beginning his flight to the Calhoun County Airport at about 1:00 p.m. on January 14. Brooks also did not seek updated weather information or NOTAM reports during his flight to the Calhoun County Airport.

During the flight from Dallas, Brooks received clearance from Houston Air Traffic Control Center for an instrument approach to the Calhoun County Airport. Brooks again was not given any information by the air traffic controller regarding the construction at the Calhoun County Airport. However, air traffic controllers at en route facilities generally are not responsible for furnishing weather or NOTAM information unless the controller has actual knowledge of it or the pilot requests it. Although the NOTAM information regarding the construction was circulated to Houston, the controller who cleared Brooks' plane did not know of the construction at the Calhoun County Airport.

After receiving clearance from Houston, Brooks called Palacios Flight Service Station en route to cancel his Instrument Flight Rules plan and to request information about the wind direction, velocity, and altimeter setting at Palacios. Although Palacios was informed of the construction at the Calhoun County Airport, once again Brooks was not advised. The supervisor of the flight service station specialist who advised Brooks testified that it would have been "good practice" to have furnished Brooks the construction information. The Government has conceded negligence on the issue of this failure at the trial court and on both of the appeals to this Court.

There is no FAA control tower at the Calhoun County Airport. Instead, pilots contact an air-to-ground radio communication facility known as a UNICOM to contact airport personnel. Although contacting the UNICOM is good operating procedure, Brooks failed to do so. Had Brooks contacted the UNICOM, he would have learned of the construction on the runway because the airport employee operating the UNICOM had been advising all aircraft calling the airport about the runway construction. Brooks also failed to fly over the intended landing area in order to detect any unusual conditions; such fly-overs are considered good operating procedures for landings at airports without a control tower.

Brooks attempted to land on Runway 32. The construction company working on the runway had placed yellow wooden markers off the end of Runway 32. On the original trial of this matter, the district court found this marking deficient under FAA recommendations because it was in the form of a "+" rather than an "x" and because the marker was placed in the grass in front of the runway rather than across the number "32" painted on the end of the runway. Brooks, focusing his attention during landing on the first third of the runway as he approached it, did not see the marking. His plane ran onto the area under construction, and it sustained damage.

### B. *Procedural History*

On the original trial of this matter, the trial judge, proceeding without a jury,

found both the FAA and Brooks to have been negligent. The trial judge found the FAA negligent in two ways: (1) the failure of the FAA employees in Dallas, Houston, and Palacios to advise Brooks of the NOTAM; and (2) the FAA's failure to properly mark the closed runway. Brooks was found to have been negligent in failing (1) to obtain all available information on his flight prior to takeoff; (2) to make radio contact with the UNICOM at the Calhoun County Airport; and (3) to overfly the airport before landing. The trial judge found the FAA to have been seventy-five percent negligent and Brooks twenty-five percent negligent.

On the first appeal to this Court, the judgment of the district court was substantially affirmed. This Court reversed only the conclusion of the district court that the FAA had been negligent in failing to properly mark the runway. All of the other findings of negligence against both the FAA and Brooks were affirmed. The Court then remanded the case to the district court in order for the district court accordingly to reapportion the comparative negligence of the parties.

On remand, the district court amended its Findings of Fact and Conclusions of Law. It deleted its original finding that the FAA had been negligent in failing to mark the runway properly; it then reapportioned the comparative negligence of the parties at sixty percent for the Government and forty percent for Brooks.

## II. THE MERITS

The Government contends that (1) the district court's statement of facts regarding apportionment of fault is insufficiently specific under Fed.R.Civ.P. 52(a); (2) the district court's apportionment of fault in any event is clearly erroneous; and (3) the district court's finding of proximate cause is clearly erroneous. We deal initially with the two contentions regarding the district court's apportionment of fault.

### A. *Apportionment of Fault*

■ The Government contends at the outset that the district court's findings

reapportioning fault are deficient under Fed.R.Civ.P. 52(a). Rule 52(a) states, "In all actions tried upon the facts without a jury ..., the [district] court shall find the facts specially and state separately its conclusions of law thereon...." The Government admits that the trial court is not required by Rule 52(a) to make specific findings on all issues so long as the trial court makes findings on the facts necessary to reach a decision; the Government, however, points to cases in this Circuit which have noted that findings of fact by a district court must be specific enough to give appellate courts a clear understanding of the basis of the trial court's decision and to ensure that the trial court has taken care in ascertaining the facts. *See Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 432–33 (5th Cir.1977). The Government argues that the findings in the instant case are deficient since the findings do not explain why the trial court apportioned fault as it did.

The Government's contention must be rejected under the circumstances of the case at bar. In *Flowers Transportation, Inc. v. M/V PEANUT HOLLINGER*, 664 F.2d 112 (5th Cir.1981), the defendant contended that the trial court's apportionment of fault was clearly erroneous. This Court noted, "Comparative fault cannot be apportioned with formulaic precision." *Id.* at 114. While the district court's findings in *Flowers Transportation* had greater specificity than the district court's findings in the instant case, the district court's findings in *Flowers Transportation* had no greater specificity concerning the allocation of negligence than the district court's findings in the instant case. Moreover, the findings of negligence for both parties have already undergone a previous appeal, and this Court upheld (with one exception) those findings. Given such an upholding of its prior assessment of the case, it is not surprising that on remand the district court essentially reaffirmed its previous findings and modified its original opinion by delet-

ing its one erroneous finding and adjusting the apportionment of fault accordingly.[4]

■ The Government also argues that the district court's apportionment of fault is clearly erroneous. The Government's argument rests on its interpretation of this Court's opinion on the first appeal of the instant case. The Government construes this Court's prior opinion to hold that the Government's negligence through its various FAA employees was slight while Brooks' negligence in piloting the plane was significant. The Government argues that, as a matter of law, Brooks' negligence exceeded that of the FAA personnel. The Government concludes that the plaintiff Brooks can recover nothing since the Texas comparative negligence statute provides that no recovery is allowed a plaintiff whose responsibility for the accident exceeds fifty percent. *See* Tex.Rev.Civ.Stat. Ann. art. 2212a § 1 (Vernon Supp.1984).

The Court's opinion in the prior appeal does state that, had it been the trial court, its reading of the evidence "might have been different." 695 F.2d at 989. However, the Court then explicitly and carefully explained that the district court's findings were not clearly erroneous with the one exception of the finding regarding the marking of the runway.[5] Nor did the prior opinion in any way require a finding by the district court that Brooks' negligence ex-

ceeded the Government's. Rather, that particular issue was left open for the district court. The Court on the prior appeal stated:

> The United States urges us ... to ourselves reapportion the comparative negligence of the parties. Assuming that we possess that power, we yet conclude that the task is better done in the first instance by the [district court]. We are likewise of the opinion that since the judgment below is reversed in part and since a reapportionment of comparative fault *may* result in judgment for the United States, the parties' arguments about the correct rate of interest ... are best directed to that court.

*Brooks,* 695 F.2d at 990–91 (emphasis added).

Nor is the district court's reapportionment of negligence clearly erroneous. The Government conceded that the Palacios controller was negligent in failing to inform Brooks of the runway condition within minutes of Brooks' landing. Moreover, the district court again found the Dallas and Houston FAA employees negligent in failing to advise Brooks of the NOTAM. Given such findings, which were affirmed by this Court on the prior appeal, it cannot be said that the district court clearly erred on remand in assigning sixty percent fault to the Government.[6]

---

**4.** The Government's reliance on *Golf City* fails to persuade that the district court's findings are insufficiently specific. In *Golf City,* the district court opinion failed to specify even the basis of the defendant's liability, 555 F.2d at 434. In the instant case, the district court's initial opinion, which was reaffirmed on remand, explains the various acts of negligence by both the Government and the plaintiff Brooks and thus, unlike *Golf City,* explains the basis of liability.

Similarly, the Government's reliance on *Barber v. United States,* 711 F.2d 128 (9th Cir.1983), is misplaced. In *Barber,* the district judge admitted that he had amended the findings of fact to reach a predetermined result that the plaintiff would recover. In the instant case, there is no indication of any sort to support a conclusion that the district judge altered the apportionment of damages to reach a predetermined outcome.

**5.** This Court stated that in its estimation, the questions regarding the negligence of the

Government were close; nevertheless, it ultimately upheld the district court's findings:

> Although, for reasons that we will indicate briefly, we regard each of these findings as a very close one indeed and the degree of negligence indicated by the evidence slight, at most, our deference for the trial judge's determinations—based on his opportunity to hear and observe the manner of the witnesses' testimony—persuades us that although ours might have been different we should leave his undisturbed.

*Brooks,* 695 F.2d at 989.

**6.** Nor does *United States v. Schultetus,* 277 F.2d 322 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), dictate a different result. In *Schultetus,* the Court held that information given by government employees fully discharged their duty to warn pilots of the presence of other aircraft. In the instant case, the FAA employees were found negligent in failing

## B. *Proximate Cause*

■ The Government argues that it' is not liable because the trial court misapplied Texas law on the issue of proximate cause. The Government contends that Brooks' own negligence in failing to request updated flight information and in failing to contact the UNICOM at the Calhoun County Airport superseded any negligent acts committed by FAA employees in failing to advise Brooks of the runway condition. The Government concludes that Brooks' superseding negligence relieves the Government of liability.

The district court's conclusion that the negligence of the FAA employees proximately caused the accident was entered prior to the first appeal to this Court. Appealing a judgment adverse to its position on the first appeal, the Government, however, failed to raise and discuss the issue of the district court's finding of proximate cause on that first appeal. This Court has noted that an issue not briefed and discussed in an appeal before this Court may be deemed to have been waived. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 488 n. 7 (5th Cir.1984). Moreover, the Supreme Court has noted that a second appeal generally brings up for revision nothing but proceedings subsequent to the mandate following the prior appeal. *United States v. Camou,* 184 U.S. 572, 574, 22 S.Ct. 505, 506, 46 L.Ed. 694 (1902). Under the circumstances of the case at bar, the attempt to raise the issue of proximate cause comes too late to avail the Government. Thus, we decline to hold that the district court clearly erred in finding that the negligence of the FAA employees proximately caused the accident.

## III. INTEREST DURING PENDENCY OF FIRST APPEAL

In its judgment following remand by this Court, the district court ordered that Brooks recover interest on the judgment at the rate of four percent. The district court directed that such interest be calculated from March 17, 1982, to March 24, 1983, which was during the period of the pendency of the first appeal. Both the Government and Brooks contend that the district court erred. The Government contends that no interest should have been awarded the plaintiffs for the period during the pendency of the first appeal. The plaintiffs contend that the district court erred in failing to compute interest using the new federal interest statute and its higher rate of interest from October 1, 1982, (the effective date of the new statute) to the end of the period of the pendency of the first appeal (which was on March 24, 1983).

## A. *The Statutory Provisions*

Prior to October 1, 1982, 28 U.S.C. § 1961 provided generally for postjudgment interest in actions against parties other than the United States and directed that "[s]uch interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law." Awards against the United States were governed by 28 U.S.C. § 2411(b) and 31 U.S.C. § 724a. Like 28 U.S.C. § 1961, section 2411(b) of Title 28 used similar language in providing that interest should "be computed ... from the date of the judgment." Section 2411(b) of Title 28 also set the interest rate at four percent per annum, while 31 U.S.C. § 724a, an appropriations section, provided that interest should be payable "only when such judgment becomes final after review" by an appellate court. Further, the time period for the calculation of such interest was to extend "only from the date of the filing of the transcript thereof in the General Accounting Office to the date of the mandate of affirmance."

The Federal Courts Improvement Act, Pub.L. No. 97–164, 96 Stat. 25 (1982) (the "FCIA") became effective October 1, 1982. Section 2411(b) of Title 28, which had previously limited the Government's interest ob-

---

to advise Brooks of the NOTAM, and that finding was affirmed by this Court on the prior

appeal.

ligation to four percent, was deleted. Instead, 28 U.S.C. § 1961 was extended to include judgments in civil actions against the United States. Amended section 1961 also replaced the directive for applying the state rate of interest with a nationwide variable rate of interest based upon a formula using the rate paid by the Government for 52-week treasury bills (the "T-bill" rate). As amended, section 1961 continued to require that the prevailing party against the United States file a transcript with the Government and that the period during which interest was calculated ran (as it had prior to the FCIA) from the date of the filing of this transcript to the mandate of affirmance by the appellate court. 31 U.S.C. § 1304(b)(1)(A) (recodifying 31 U.S.C. § 724a).[7] Thus, the FCIA brought the United States within the general interest provision (28 U.S.C. § 1961), established a uniform rate of interest, but retained the limitation of interest running from the filing of the transcript to the date of affirmance.

In the instant case, the date of the original judgment was September 4, 1981. The transcript of this original judgment was filed on March 17, 1982. The date of this Court's mandate on the prior appeal was March 24, 1983. The Government contends that no interest at all should be awarded for the period from March 17, 1982, to March 24, 1983. Plaintiffs contend that interest should be awarded at four percent from March 17, 1982, to September 30, 1982, and at the new "T-bill" rate from October 1, 1982, (the effective date of the FCIA) to March 24, 1983.

B. *Whether Any Interest Should Be Awarded During the Pendency of the First Appeal*

The Government's contention that no interest should be awarded during the pendency of the first appeal rests on its asser-tion that this Court's prior opinion effectively vacated the original district court judgment. Since this Court's prior opinion remanded the case to the district court for a reapportionment of damages and since the Government would not have been liable had the district court on remand assigned greater fault to Brooks than to the Government's employees, the Government reasons that the panel's determination on the first appeal rendered the original district court judgment a nullity. The Government concludes that an award based on such a vacated judgment would be inconsistent with 31 U.S.C. § 1304(b)(1)(A) since that provision, in the Government's view, allows interest only if the appellate court issues a mandate affirming the district court judgment. The Government, however, concedes that "if the [C]ourt had affirmed the government's liability but ordered the trial judge to reassess damages, plaintiffs would be entitled to interest on the reduced amount." Appellant's Reply Brief at 21.

In the instant case, the original judgment was substantially affirmed by this Court on appeal. The district court on remand, acting consistently with this Court's prior opinion, reduced the Government's comparative fault by fifteen percent and again entered judgment for the plaintiffs. Under such circumstances, even where the case is nominally reversed in part and remanded, the case is to be treated for interest purposes as though the portions of the judgment unaffected by the reversal and remand were affirmed. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 545 (5th Cir.1983) (en banc); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1311 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982); *Perkins v. Standard Oil Co. of California*, 487 F.2d 672, 676 (9th Cir. 1973). *But see Merchants Matrix Cut Syndicate, Inc. v. United States*, 284 F.2d 456, 459 (7th Cir.1960).

---

**7.** As recodified, 31 U.S.C. § 1304(b)(1)(A) (formerly 31 U.S.C. § 724a) read:

(b)(1) Interest may be paid from the appropriation made by this section—

(A) on a judgment of a district court, only when the judgment becomes final after review on appeal or petition by the United States Government, and then only from the date of filing of the transcript of the judgment with the Comptroller General through the day before the date of the mandate of affirmance.

██ Such a result is consistent with this Court's decision in *Copper Liquor.* In that case, this Court, sitting en banc, held

> If a judgment for attorneys' fees or costs is later modified by the district court or an appellate court, whether the award is increased or reduced, interest on the revised award will run from the date of the original judgment unless, of course, the allowance of any amount is reversed. *Perkins v. Standard Oil of California,* 487 F.2d at 676; *Premier Corp. v. Serrano,* 471 F.Supp. 444 (S.D.Fla.1979). As the Ninth Circuit observed, interest properly accrues from the date of the initial judgment "because that is the date on which the correct judgment should have been entered." *Perkins v. Standard Oil Co. of California,* 487 F.2d at 676.

*Copper Liquor,* 701 F.2d at 545. Further, the Ninth Circuit in *Perkins,* upon which this Court relied in *Copper Liquor,* noted that "there exists no real distinction between judgments for attorneys' fees and judgments for other items of damages." *Perkins,* 487 F.2d at 675.[8] Thus, it cannot be said, under the circumstances of this Court's original decision and the district court's decision on remand, that the district court erred in awarding Brooks interest during the pendency of the first appeal.

C. *The Cross-Appeal: Whether the Change in the Rate of Interest Under Revised 28 U.S.C. § 1961 Applies to Judgments Entered Prior to October 1, 1982*

██ On its cross-appeal, the plaintiffs contend that the district court erred in fail-

ing to apply the T-bill rate as of the effective date of the FCIA (October 1, 1982).[9] Plaintiffs contend that such statutory changes in the rate of interest should apply to judgments entered prior to the effective date of the statute. Plaintiffs seek interest at the new rate from October 1, 1982, (the effective date of the statute) to March 24, 1983 (the end of the pendency of the first appeal).

This Court has previously recognized that, under *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or [unless] there is statutory direction or legislative history to the contrary." *Petrou Fisheries, Inc. v. ICC,* 727 F.2d 542, 545 (5th Cir.1984) (quoting *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016). However, consideration of the statutory language of the FCIA, judicial interpretation of the FCIA by other courts of appeals, and sound principles of judicial administration lead to the conclusion that the T-bill rate provided for in the FCIA should not apply to judgments entered prior to the effective date of the FCIA. *See Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 746 F.2d 168 (2d Cir.1984).

In *Litton,* the Second Circuit carefully considered the impact of the FCIA's change in the statutory rate of interest. The Second Circuit conducted this examination under the principles set forth by Justice Blackmun in his majority opinion for

---

**8.** Nor do we read 31 U.S.C. § 1304(b)(1)(A) (recodifying former 31 U.S.C. § 724a) or the repealed statute, 28 U.S.C. § 2411(b), to require that the judgment be final in all respects in order to start accruing interest. In the instant case, plaintiffs complied with the special requirements of judgments against the United States by filing the transcript. Instead, as in *Copper Liquor* and *Perkins,* and under the circumstances of the case at bar, the original judgment is the relevant judgment for the starting of the accrual of interest to the extent that it was permitted to stand on appeal and remand. *See Woods Exploration & Producing Co. v. Aluminum Co. of America,* 509 F.2d 784, 789 (5th

Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975); *United States v. Michael Schiavone & Sons, Inc.,* 450 F.2d 875 (1st Cir. 1971).

**9.** Thus, plaintiffs contend that the judgment of the district court, for the period during the pendency of the first appeal, should bear interest at the rate of four percent from March 17, 1982, to September 30, 1982, and at the T-bill rate in effect on the date of the original judgment from October 1, 1982, to the mandate of affirmance on the first appeal on March 24, 1983.

the Supreme Court in *Bradley.* The Second Circuit noted that while *Bradley* creates a presumption in favor of retroactive application of a statute, that presumption "may be displaced either by a fair indication that the statute, properly construed, has only prospective effect or by resulting injustice from a retroactive application." 746 F.2d at 174.

In the instant case, a fair construction of the FCIA leads to the conclusion that Congress did not intend for the T-bill rate to apply to judgments entered prior to the effective date of the FCIA. The statute directs that the "interest shall be calculated *from the date of the entry of the judgment,* at a rate equal to the coupon issue yield equivalent ... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately *prior to the date of the judgment.*" 28 U.S.C. § 1961(a) (emphasis supplied). Section 402 of the FCIA provides that the act "shall take effect on October 1, 1982." As the Second Circuit noted, the conjunction of the provision creating the effective date of the statute and the "statutory direction to calculate a rate based [on the T-bill rate] ... 'immediately prior to the date of the judgment' is a strong indication that Congress expected the new formula to apply only to judgments entered after the effective date of the statute." *Litton,* 746 F.2d at 174.[10]

Moreover, this result is consistent with the practice of courts in applying and interpreting the FCIA's amendments to section 1961. In providing for the effective date of the FCIA, Congress noted, "The delay is

intended to provide time for planning the transition and for permitting the bar to become familiar with the provisions." S.Rep. No. 97–275, 97th Cong., 1st Sess. (1981), U.S.Code Cong. & Admin.News 1982, pp. 11, 42. During this interim period, the Administrative Office of the United States Courts expressed its opinion that the amended procedures would apply only to judgments entered on or after October 1, 1982. Although the views of the Administrative Office are not entitled to the deference of an administrative agency charged with administering a statute, its opinion indicates the practice of federal courts nationwide in implementing the transition of the FCIA amendments. *See Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 568 F.Supp. 507, 514 (S.D.N.Y. 1983), *aff'd* 746 F.2d 168 (2d Cir.1984). Indeed, it appears that courts generally have not applied the new T-bill process to judgments entered before October 1, 1982. *See Merit Insurance Co. v. Leatherby Insurance Co.,* 728 F.2d 943 (7th Cir.) (per curiam), *cert. denied,* ___ U.S. ___, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *Peterson v. Crown Financial Corp.,* 553 F.Supp. 114, 117 n. 4 (E.D.Pa.1982); *United States ex rel. Billows Electric Supply Co. v. E.J.T. Construction Co., Inc.,* 557 F.Supp. 514, 516 (E.D.Pa.1983), *aff'd,* 729 F.2d 1450 (3d Cir.1984). *See also United States v. Dollar Rent A Car Systems, Inc.,* 712 F.2d 938 (4th Cir.1983). *But see R.W.T. v. Dalton,* 712 F.2d 1225, 1235 (8th Cir.), *cert. denied,* ___ U.S. ___, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Handgards, Inc. v. Ethicon, Inc.,* 552 F.Supp. 820 (N.D.Cal. 1982), *aff'd,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* ___ U.S. ___, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985).[11]

---

**10.** As the district court in *Litton* noted:

Litton, however, is not arguing for a change in the rate but for a change in the process by which the rate is established. It is only indirectly, through application of that different method of calculation, that Litton contends a higher rate should attach in this case. But the process Litton seeks to utilize is, in this case, keyed into conditions as they existed [prior to the effective date of the statute]. The 13.146% rate computed under the procedure advocated

by Litton in no way reflects conditions in existence on October 1, 1982.

*Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 568 F.Supp. 507, 514 (S.D.N.Y. 1983).

**11.** Neither the Eighth Circuit's opinion in *R.W.T.* nor the district court's opinion in *Handgards* extensively discussed the application of the T-bill process to judgments entered prior to the effective date of the FCIA.

Finally, this Court's conclusion in the instant case is reinforced by the considerations set forth in *Bradley*. In *Bradley*, the Supreme Court directed that the three factors to consider in deciding whether "manifest injustice" will result from a ruling in favor of retroactivity are: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley*, 416 U.S. at 717, 94 S.Ct. at 2019. Regarding the first of these three elements, Chief Justice Marshall cautioned that in matters involving rights between private parties, a retroactive construction is not favored. *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). Although the suit here involves the United States, it acts much like a private party in the instant case; further, the FCIA T-bill process of determining interest is aimed both at private litigants and the United States. Regarding the last two elements of the *Bradley* considerations, creating a rule allowing amended 28 U.S.C. § 1961 to apply to judgments entered prior to its effective date could significantly affect the rights of appellants who had relied on the pre-FCIA statute in deciding to appeal or who had relied on pre-FCIA district court judgments setting forth the pre-FCIA rate at the time the decision was made to take the appeal. *See Litton*, 746 F.2d at 175–76.[12] Thus, it cannot be said that the district court erred in applying a four percent interest rate during the period of the first appeal.

## IV. CONCLUSION

Accordingly, the judgment of the district court both on the merits and on interest issues is

AFFIRMED.

**12.** The writing in the instant case, of course, expresses no opinion about the retroactive application of other provisions of the FCIA. Further, it should be kept in mind that the instant case differs from other cases in which courts have interpreted a change in the rate of interest in that the FCIA prescribes a new *method* of computing the rate of interest. *See Litton,* 746 F.2d at 175.