**Duncan CAMPBELL, Individually and as personal representative of the Estate of Carolyn Louise Campbell, deceased; Plaintiff-Appellant,**

**v.**

**UNITED STATES of America; James A. Baker, Office of the Secretary of the Department of the Treasury; Charles A. Bowsher, Controller General Comptroller; Defendants-Appellees.**

**No. 86–1622.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1986.

Decided Feb. 3, 1987.

Mark S. Davis, Honolulu, Hawaii, for plaintiff-appellant.

Wendy M. Keats, Washington, D.C., for defendants-appellees.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

NELSON, Circuit Judge:

This case presents a narrow, somewhat esoteric issue: whether a provision of the Federal Courts Improvement Act of 1982 ("FCIA"), Pub.L. No. 97–164, tit. III, pt. B, § 302, 96 Stat. 25, 55–56 (1982) (codified in part at 28 U.S.C. § 1961 (1982)), which governs the rate of post-judgment interest on money judgments in civil cases in federal district courts, applies to judgments against the United States entered after the FCIA's date of enactment and before its effective date. The district court held that the provision applies only to judgments entered after the FCIA's effective date. Appellant argues that, for judgments entered before the effective date, the former interest rate should apply in the period prior to the effective date and that the new rate should apply in the period following the effective date. We agree with appellant's contention and, accordingly, we reverse and remand.

## I. STATUTORY CHANGES

Prior to the enactment of the FCIA, federal law prescribed a 4% post-judgment interest rate for money judgments entered against the United States in district court.

See 28 U.S.C. § 2411(b) (1976). Interest was ordinarily payable only for the period after a transcript of the judgment was filed with the Comptroller General and through the day before the date of a mandate of affirmance. See 31 U.S.C. § 724a (1976). The statutes made no provision for annual compounding of interest. The former statutory framework also provided that interest on judgments against parties other than the United States would be imposed at the rate prescribed by state law. See 28 U.S.C. § 1961 (1976). Such interest accrued from the date of entry of the judgment to the date of payment. See id.

The FCIA altered the statutory framework in several respects and left other provisions intact. First, it repealed 28 U.S.C. § 2411(b), thus eliminating the 4% rate and leaving 28 U.S.C. § 1961 to encompass judgments against the United States as well as those against other parties. See FCIA § 302(b)(2), 96 Stat. at 56. Second, it eliminated the state-by-state interest rates and prescribed a national, uniform interest rate applicable to judgments against any party. This "T-bill rate" is equal to "the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." FCIA § 302(a)(2), 96 Stat. at 55 (codified at 28 U.S.C. § 1961(a) (1982)). Third, the FCIA left intact the limitation on the allowable interest period for judgments against the United States. See 31 U.S.C. § 1304(b)(1)(A) (1982) (recodifying former 31 U.S.C. § 724a). Finally, the FCIA provided that any such interest shall be compounded annually. See FCIA § 302(a)(3), 96 Stat. at 56 (codified in part at 28 U.S.C. § 1961(b) (1982)). The FCIA was enacted on April 2, 1982, and it carried an effective date of October 1, 1982. FCIA § 402, 96 Stat. at 57–58.[1]

---

1. Hence the current statutory provisions governing post-judgment interest on judgments against the United States in civil cases in district court (other than internal revenue tax cases) are as follows. Section 1961 provides in relevant part:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execu-

The general congressional purposes behind these changes are clearly, though briefly, stated in the Senate committee report accompanying the bill:

> Under current law, the interest rate on judgments in the Federal courts is based on varying State laws and frequently falls below the contemporary cost of money. [This provision] sets a realistic and nationally uniform rate of interest on judgments in the Federal courts that would be keyed to the prime interest rate.... This eliminates an economic incentive which exists today for a losing defendant to appeal a judgment and accumulate interest on the judgment award at the commercial rate during the pendency of the appeal.

S.Rep. No. 275, 97th Cong., 2d Sess. 11, *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 21; *see also id.* at 30, *reprinted in* 1982 U.S.Code Cong. & Admin. News at 40. The floor debates also indicate that Congress was concerned more about private parties taking frivolous appeals in order to benefit from favorable interest rates than about the United States doing so, because the government pays adverse judgments and interest ministerially and appeals "only when substantial issues of law are at stake." 127 Cong.Rec. 29,865 (1981) (statement of Sen. Grassley); *id.* at 29,866 (letter from David Stockman, Director of the Office of Management and Budget, to Sen. Dole, Dec. 3, 1981). Hence the principal purpose of awarding interest on judgments against the government is to compensate plaintiffs for the loss of the use of the money during an unsuccessful appeal. *See Devex Corp. v. General Motors Corp.*, 749 F.2d 1020, 1024 (3d Cir. 1984) (stating that the policy of § 1961 is "compensation of the wronged party for loss of the use of money"), *cert. denied,* — U.S. —, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985); Note, *Interest on Judgments in the Federal Courts,* 64 Yale L.J. 1019, 1019 (1955); *see also* S.Rep. No. 275, 97th Cong., 2d Sess. 11–12, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 21–22 (noting this purpose in the context of a proposed provision for pre-judgment interest). Unfortunately, as discussed below, the legislative history concerning the effect of the FCIA's post-judgment interest provision on unpaid judgments entered prior to the date of enactment is sparse.

## II. PROCEDURAL BACKGROUND

The dispute that has ultimately resulted in this appeal arose from a medical malpractice action brought under the Federal Torts Claims Act for injuries sustained by appellant Campbell's wife. On June 17, 1982, two-and-one-half months after Congress enacted the FCIA, the district court

---

tion may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

 (b) Interest shall be computed daily to the date of payment except as provided in ... section 1304(b) of title 31, and shall be compounded annually.

28 U.S.C. § 1961(a), (b) (1982). Section 1304 of title 31, which provides a continuous appropriation of amounts necessary to pay "final judgments ... and interest" rendered against the United States, *see* 31 U.S.C. § 1304(a) (1982), also provides in relevant part:

 (b)(1) Interest may be paid from the appropriation made by this section—

 (A) on a judgment of a district court, only when the judgment becomes final after review on appeal or petition by the United States Government, and then only from the date of filing of the transcript of the judgment with the Comptroller General through the day before the date of the mandate of affirmance;
 . . .
 . . .
 (2) Interest payable under this subsection in a proceeding reviewed by the Supreme Court is not allowed after the end of the term in which the judgment is affirmed.

*Id.* § 1304(b)(1)(A), (2). Presumably, a party may still seek post-judgment interest that is not funded under § 1304 through the traditional route of petitioning Congress for a special appropriation act for the amount that would accrue under § 1961. *See Rooney v. United States,* 694 F.2d 582, 583 n. 2 (9th Cir.1982).

entered a judgment in favor of Campbell for $2,407,034.41. The judgment did not include a provision for post-judgment interest. The government appealed on August 12, and the act became effective on October 1. Campbell filed a transcript of the judgment with the Comptroller General on January 14, 1983, thereby starting the clock on the government's interest liability. On June 10, 1983, the Ninth Circuit affirmed the judgment, and a mandate of affirmance issued without mention of any interest. The Ninth Circuit denied the government's subsequent motion to recall and amend the mandate on August 3, 1983.

One month later, the United States filed a Rule 60(b) motion in the district court seeking to modify the judgment in view of Mrs. Campbell's intervening death. On November 28, 1983, the district court denied the government's motion and granted Campbell's motion to enforce the judgment with "interest as provided by law." On February 6, 1984, the United States paid Campbell the principal amount of the judgment, but made no payment of interest.

Eighteen months later, after several unsuccessful attempts to secure payment of interest from the government, Campbell filed suit in federal district court to obtain interest at the T-bill rate of approximately 13.6%[2] on June 17, 1982. The district court, granting partial summary judgment in favor of Campbell, ruled that the allowable period of interest began on January 13, 1983—the date on which Campbell filed a transcript of the judgment with the Comptroller General—and ended on November 28, 1983—the date of the denial of the Rule 60(b) motion. It held, however, that Campbell was entitled only to the 4% interest rate under former 28 U.S.C. § 2411(b) (1976), and not the T-bill rate. The district court compounded the interest

at 4% annually. At the time Campbell filed notice of appeal, a motion for attorneys' fees was unresolved.

On appeal, Campbell argues that the district court should have applied the T-bill rate under the FCIA and that the interest should have been compounded at that rate.[3]

## III. DISCUSSION

▮▮▮▮ We have jurisdiction over this appeal because the judgment of the district court is "final" for the purposes of 28 U.S.C. § 1291 (1982), notwithstanding the existence of an unresolved attorneys' fees motion at the time the appeal was taken. *International Ass'n of Bridge, Structural, Ornamental, & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 657–59 (9th Cir.1984). The interpretation of the applicability of the FCIA to judgments entered prior to its effective date presents an issue of law, which we review de novo. *See In re Reynolds*, 726 F.2d 1420, 1421 (9th Cir.1984).

### A. Cases Interpreting the FCIA's Post-Judgment Interest Provision

At the outset we note that the issue raised in this appeal has not previously been presented to a panel of the Ninth Circuit. In *Turner v. Japan Lines, Ltd.*, 702 F.2d 752 (9th Cir.1983) (per curiam), this court held that a change in an Oregon post-judgment interest statute should not be applied to judgments entered before the statute's July 1979 effective date, even if only for the period following the effective date. *See id.* at 757–58 (interpreting prior Oregon decisions construing this and other Oregon statutes). The plaintiff in *Turner* apparently did not argue that the FCIA's T-bill rate should be applied in the period following the October 1, 1982 effective date

---

**2.** Materials in the record variously state that the appropriate T-bill rate for June 17, 1982 was 13.51%, 13.61%, 13.63%, and 13.65%. The district court did not need to reach a determination on the correct T-bill rate, and we do not attempt to do so here.

**3.** The government notes in its appellate brief that it does not concede—but has not appeal-

ed—the issues whether the interest should have been compounded under former 28 U.S.C. § 2411(b) and whether the allowable period of interest should extend beyond the day before the date of the mandate of affirmance to the date of the denial of the Rule 60(b) motion. Because these issues are not properly before us, we express no opinion on them.

of the FCIA, and the Ninth Circuit panel did not address the question. *See id.* In a footnote, however, the court commented on the soundness of the Oregon law it applied:

Since changes in the statutory rate presumably reflect changes in the value of use of money in a dynamic market economy and since the function of interest in the judicial process is to compensate the wronged individual for the loss of use of money, a sounder rule regarding the rate of interest applicable during the period from injury or breach to payment would be to permit the rate to vary during the period according to the changes in the statutory rate.

*Id.* at 758 n. 9. Thus, Campbell's assertion that the Ninth Circuit has already "adopted" this rationale with respect to the FCIA is mistaken: to the extent that the observation comments on Oregon law, it is inapposite to our case; to the extent that the observation might be construed to comment on the application of the FCIA, it is dictum.

In a second Ninth Circuit case, the issue was considered to some degree below but was not presented on appeal. In *Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820 (N.D.Cal.1982), *aff'd,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985), the district court applied the FCIA to a judgment against a private party entered prior to the act's effective date. It imposed interest at the state rate under former 28 U.S.C. § 1961 (1976) for the period prior to October 1, 1982 and at the T-bill rate for the period after October 1, 1982. The lower court's opinion, however, indicates that the parties may have agreed that this application of the FCIA was correct, an indication that is supported by the fact that this issue was not challenged on appeal to the Ninth Circuit. *See Handgards,* 743 F.2d at 1298–1300 (affirming interest award on other grounds without mentioning the FCIA issue); *see also International Telemeter, Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1494–95 (9th Cir.1985) (applying a stipulated state interest rate to a November 1981 judgment where the parties did not raise the FCIA issue). Hence, because

the issue raised on this appeal was not presented to the Ninth Circuit in *Turner, Handgards,* or *International Telemeter,* we are not compelled to follow any of their conflicting results.

Courts in other jurisdictions have addressed the issue squarely, but have reached differing conclusions. Three principal interpretations are possible: (1) the FCIA applies only to judgments entered after the effective date, (2) it applies to judgments entered before the effective date for the entire post-judgment period, and (3) it applies to judgments entered before the effective date but only for interest accruing in the period after the effective date. Each of these interpretations has found judicial approval.

A majority of the circuits that have addressed the issue have concluded that the FCIA should apply only to judgments entered after the effective date. *See Brooks v. United States,* 757 F.2d 734, 741–43 (5th Cir.1985) (holding that the FCIA does not apply to a September 1981 judgment against the United States for interest accruing after the act's effective date); *Litton Sys. v. American Tel. & Tel. Co.,* 746 F.2d 168, 174–76 (2d Cir.1984) (holding that the FCIA does not apply to a June 1981 judgment against a private party for interest accruing either after the judgment or after the effective date); *Merit Ins. Co. v. Leatherby Ins. Co.,* 728 F.2d 943, 944 (7th Cir.1984) (per curiam) (rejecting without discussion the argument that the FCIA should apply to a November 1981 judgment for interest accruing after the judgment); *see also Elias v. Ford Motor Co.,* 734 F.2d 463, 467 (1st Cir.1984) (applying the state rate under former § 1961 to an April 1982 judgment when the parties agreed that the state rate should be applied); *United States v. Dollar Rent A Car Sys.,* 712 F.2d 938, 940 n. 5 (4th Cir.1983) (observing that "[t]here is no indication that the statute was intended to have retroactive effect," but noting that the parties had not raised the issue); *United States ex rel. Billows Elec. Supply Co. v. E.J.T. Constr. Co.,* 557 F.Supp. 514, 516–17 (E.D.Pa.1983) (holding that the FCIA does not apply to a July 1981 judgment against a private party for inter-

est accruing after the judgment), *aff'd mem.,* 729 F.2d 1450 (3d Cir.1984); *Peterson v. Crown Fin. Corp.,* 553 F.Supp. 114, 116–17 n. 4 (E.D.Pa.1982) (same holding for a July 1979 judgment).[4]

The Eighth Circuit has adopted the second interpretation—that the FCIA applies to judgments entered before the act's effective date for interest accruing in the entire period following the judgment. *See R.W.T. v. Dalton,* 712 F.2d 1225, 1234–35 (8th Cir.) (holding that the FCIA rate should apply to a March 30, 1982 judgment against a private party for the entire post-judgment period), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

Finally, as noted above, one court has implicitly endorsed the position that the FCIA should apply to judgments entered before the act's effective date but only for the period following the effective date. *See Handgards, Inc. v. Ethicon, Inc.,* 552 F.Supp. 820, 821 (N.D.Cal.1982) (applying this interpretation to an August 6, 1982 judgment, but indicating that the parties may have agreed on this interpretation), *aff'd on other grounds,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). We also note that the Ninth Circuit has upheld the award of discretionary pre-judgment interest at the FCIA's T-bill rate for periods before the act's effective date. *See Columbia Brick Works, Inc. v. Royal Ins. Co.,* 768 F.2d 1066, 1068–71 (9th Cir.1985); *Western Pac. Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1288–89 (9th Cir.1984). Because of the current split in the circuits, we examine the FCIA in detail.

*B. Applicability of the FCIA's Post-Judgment Interest Provision to Judgments Entered After the Enactment Date and Before the Effective Date*

*1. Bradley, Linkletter, and "Retroactivity"*

Both parties urge us to apply the rule set out in *Bradley v. School Bd.,* 416 U.S. 696,

94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711, 94 S.Ct. at 2016. The district court implicitly applied this rule by stating that it followed the "persuasive analysis and authority" in the Second and Fifth Circuit decisions in *Litton* and *Brooks,* which employed the *Bradley* rule. Although *Bradley* and the principal cases on which *Bradley* relied, *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), and *Thorpe v. Housing Auth.,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), enunciated the rule in the context of a change in law during the pendency of a direct appeal on that very issue, *see Bradley,* 416 U.S. at 710–15, 94 S.Ct. at 2015–18, the rule may also apply in cases involving changes in law prior to the district court's determination of the issue, *see In re Reynolds,* 726 F.2d 1420, 1422 (9th Cir.1984); *id.* at 1425 (Wallace, J., concurring); *Bunch v. United States,* 548 F.2d 336, 337–39 (9th Cir.1977); *see also Bell v. New Jersey,* 461 U.S. 773, 793, 103 S.Ct. 2187, 2198–99, 76 L.Ed.2d 312 (1983) (White, J., concurring). The *Bradley* rule, however, does not apply to situations in which a change in the law might affect "a final judgment under collateral attack." *Bradley,* 416 U.S. at 710–11, 94 S.Ct. at 2015–16 (footnotes omitted). The latter situation is governed by principles set out in *Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965).

Application of the *Bradley* rule to this case is not a foregone conclusion because, in some respects, Campbell's suit in district court to obtain interest after the Ninth Circuit upheld the judgment on appeal resembles a collateral attack subject to the *Linkletter* rule. The Second Circuit con-

---

**4.** We also note that the Administrative Office of the United States, whose views are not entitled to deference by this court, has indicated support for this interpretation of the statute. *See Litton*

*Sys. v. American Tel. & Tel. Co.,* 568 F.Supp. 507, 514 (S.D.N.Y.1983), *aff'd,* 746 F.2d 168 (2d Cir.1984).

sidered a similar problem in *Litton.* There, the district court entered a June 1981 judgment against a private party that specified post-judgment interest at the 9% state rate, pursuant to former 28 U.S.C. § 1961 (1976). Subsequent to the enactment of the FCIA, the Second Circuit affirmed the judgment on other grounds in February 1983. Six months later, the prevailing party filed a motion in district court to amend the judgment to reflect the FCIA's T-bill rate. On appeal from a denial of this motion, the Second Circuit held that the *Bradley* rule, although not limited to cases in which the intervening law concerns the precise issue pending before the appellate court, is not an invitation to collateral attack. *Litton,* 746 F.2d at 171. The court concluded that the plaintiff should have raised the issue before the first appellate court—if only to preserve the issue for determination on remand—but excused the plaintiff in this case because the Second Circuit was interpreting *Bradley* for the first time. *Id.* at 171–72. It therefore applied *Bradley,* not *Linkletter.*

Although we believe that the Second Circuit's cogent analysis of *Bradley* is correct, the case before us contains an important distinction. *Litton* involved a judgment against a private party, in which the district court expressly included a provision for post-judgment interest that ran from the entry of judgment. In Campbell's case, the original judgment did not provide for post-judgment interest because, in cases involving a judgment against the United States, the availability of post-judgment interest is contingent on the occurrence of two future events. Interest is available only if (1) the government appeals, *see Alyeska Pipeline Serv. Co. v. United States,* 62 Comp.Gen. 4, 6–9 (1982); 31 U.S.C. § 1304(b)(1)(A) (1982), and (2) the prevailing party files a transcript of the judgment with the Comptroller General, *see Rooney v. United States,* 694 F.2d 582, 583 (9th Cir.1982); 31 U.S.C. § 1304(b)(1)(A) (1982). Hence, although as in *Litton* the change in law occurred after the entry of judgment and during the pendency of an appeal, Campbell had no adverse decision

of a district court concerning the appropriate interest rate to challenge on the original appeal.

■ Campbell might have raised the FCIA issue when he earlier opposed the government's appeal of the initial judgment in this court, but he had no reason, and was not required, to do so. Although our earlier mandate of affirmance did not include any award of interest, interest attaches by force of law. *See* Fed.R.App.P. 37 advisory committee note; *cf. Waggoner v. R. McGray, Inc.,* 743 F.2d 643, 644 (9th Cir. 1984) (per curiam) (stating that interest accrues by force of law on a judgment against a private party from the date of judgment, whether or not the judgment specifically provides for it). Campbell was thus entitled to expect payment of interest from the government—normally a ministerial function. When the government did not pay, he sued to collect. *See* 28 U.S.C. § 1961(a) (1982) (providing that parties entitled to interest may seek a levy for execution of interest liability). Because this suit presented the first opportunity to challenge the government's assertion that it was subject only to the 4% rate, we do not consider Campbell's suit to be a "collateral" attack on a judgment within the meaning of *Linkletter. Bradley* thus requires that a court —here, the district court—apply the law in effect at the time it renders its decision, unless there is statutory direction to the contrary or manifest injustice would result. *A fortiori, Bradley* provides the starting point for our analysis. *See In re Reynolds,* 726 F.2d at 1422.

At first blush, the *Bradley* presumption of applying the law in effect at the time a court renders a decision in the absence of contrary legislative direction seems inconsistent with another long-standing rule of statutory construction, *i.e.,* that statutes are presumed to have only "prospective" effect and will be given "retroactive" effect only if there is affirmative legislative direction to do so. *See, e.g., Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir.1985) (per curiam); *Puget Sound Power & Light Co. v. Federal Power Comm'n,*

557 F.2d 1311, 1314 (9th Cir.1977). On closer inspection, however, there is no conflict. Although the term "retroactive" is commonly used to refer to statutes that operate on pre-enactment transactions and pre-existing rights or obligations, *see* 2 N. Singer, *Statutes and Statutory Construction* § 41.01, at 337 (Sands 4th rev. ed. 1986), a statute is not "retroactive" simply because facts from the pre-enactment period are implicated, *see id.* § 41.01, at 338, § 41.02, at 341; *accord Alexander v. Robinson,* 756 F.2d 1153, 1155 n. 5 (5th Cir. 1985). Indeed, the presumption against "retroactivity" has generally been applied only when application of the new law would affect rights or obligations existing prior to the change in law. *See In re Reynolds,* 726 F.2d at 1422, 1424 (distinguishing cases involving property rights from those that do not); *id.* at 1425 (Wallace, J., concurring); Slawson, *Constitutional and Legislative Considerations in Retroactive Lawmaking,* 48 Calif.L.Rev. 216, 216 (1960) (arguing that the concept of "retroactivity" in the civil context does not impose restrictions beyond the constraints of substantive due process).

Hence, in a case in which application of the new law might have constituted a taking of property rights, the Supreme Court recently departed from the *Bradley* presumption and instead applied the " ' "cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided." ' " *United States v. Security Indus. Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982) (quoting *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978) (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932))). Similarly, in *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), the Court held that a departure from the *Bradley* presumption in favor of a presumption of prospective effect was warranted in a case in which application of the new law would affect rights that " 'had matured or become unconditional.' " *See id.* at 639–41, 105 S.Ct. at 1560 (quoting *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020).

As the *Bennett* Court acknowledged, in some cases application of the *Bradley* rule may subsume an assessment of pre-existing rights and obligations in *Bradley*'s exception for "manifest injustice," discussed below: one of the factors considered is whether application of the change in law would affect "matured or ... unconditional" rights. *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. "This limitation comports with another venerable rule of statutory interpretation, *i.e.,* that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Bennett,* 470 U.S. at 639, 105 S.Ct. at 1560.

We apply the *Bradley* presumption in this case because application of the FCIA to judgments against the United States for interest accruing in the period following the effective date would not pose the possibility of any constitutional problems that would counsel an interpretation of the statute in a manner that would avoid such problems. *See In re Reynolds,* 726 F.2d at 1422 (noting absence of ex post facto, bill of attainder, and due process concerns in application of change in bankruptcy laws); *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966, 970–72 (2d Cir.1985) (departing from *Bradley* presumption to avoid ex post facto problems in applying change in trademark counterfeiting law that would have exposed defendant to penal treble damages). In particular, the interpretation of the FCIA advanced here would not affect pre-existing rights that " 'had matured or become unconditional,' " a situation that might warrant reversal of the *Bradley* presumption of retroactive effect in favor of a presumption of prospective effect. *See Bennett,* 470 U.S. at 639–40, 105 S.Ct. at 1560 (quoting *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020).[5]

---

5. In *Bennett,* the Court found that the government's right to recover misused funds that were disbursed under a federal grant program, which the Court emphasized was " 'in the nature of a contract,' " had matured prior to the change in law. *See Bennett,* 470 U.S. at 638–39, 105 S.Ct.

### 2. Statutory Direction or Legislative History

We thus turn to the statute and legislative history for an indication that the FCIA should not be applied to interest accruing after the effective date on judgments entered prior to that date. "[E]ven where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018; *accord In re Reynolds*, 726 F.2d at 1422. *Bradley*, however, does not require that there be a "clear" or explicit legislative direction to the contrary; it only establishes a presumption. *See Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018. We agree with the Second and Fifth Circuits that this presumption may be displaced by "a fair indication that the statute, properly construed, has only prospective effect." *Litton*, 746 F.2d at 174; *accord Brooks*, 757 F.2d at 742. But if the legislative history could support either position, the *Bradley* presumption should control. *See Bradley*, 416 U.S. at 715–16, 94 S.Ct. at 2018–19.

■ The government argues, as did the court in *Litton*, that the fact that the rate of interest is tied to the date of judgment provides "a strong indication" that the statute was intended to apply only to judgments entered after the effective date. *See Litton*, 746 F.2d at 174; *see also Brooks*, 757 F.2d at 742 (following *Litton* ). We are unable to see the compelling logic of this deduction. Tying the rate of interest to the T-bill rate on the date of judgment accomplished just that; it permitted the rate to be "reviewed and revised periodically." S.Rep. No. 275, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 40. By itself, the method of computing interest does not shed any

light on whether the FCIA should or should not apply to unpaid judgments.

■ Nor are we persuaded by the government's argument, also employed in *Litton*, that there is a significant difference between the FCIA's imposition of a new method of computing interest and a mere change in the rate. In general, in the absence of contrary state authority, federal courts have construed changes in the rate imposed under state statutes to apply to unpaid judgments in the period after the effective date. *See Morley v. Lake Shore & M.S. Ry.*, 146 U.S. 162, 168, 13 S.Ct. 54, 56, 36 L.Ed. 925 (1892); *Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.*, 684 F.2d 1383 (11th Cir. 1982); *Spang Indus. v. Aetna Casualty & Surety Co.*, 512 F.2d 365, 372 (2d Cir.1975); *see also Turner v. Japan Lines, Ltd.*, 702 F.2d 752 (9th Cir.1983) (per curiam) (refusing to apply a change in interest rate to an unpaid judgment because of apparently contrary state court decisions); *Weyerhauser Co. v. Reliance Ins. Co.*, 707 F.2d 366, 367 (9th Cir.1983) (Kilkenny, J., specially concurring) (reluctantly following *Turner* but stating that a better decision would have applied the new state statute in order to prevent unfairness to the prevailing party caused by the former below-market rate). The *Litton* and *Brooks* courts acknowledged this line of cases, but argued that departure was warranted because the FCIA imposed a new method of computing the interest. *See Litton*, 746 F.2d at 175; *Brooks*, 757 F.2d at 743 n. 12. Congress did in fact impose a new method, but we do not see why a change in the method should entail a different legal consequence from a "mere" change in rate. Instead of periodically amending former § 2411(b) to reflect changes in actual market rates—a rather tedious task—Congress followed the much

at 1559 (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)). This situation, coupled with practical considerations, the Court held, warranted an exception to the *Bradley* presumption of applying the law in effect at the time of decision. *See id.* at 639–41, 105 S.Ct. at 1560–61. The *Bennett* Court acknowledged that *Bradley*—which involved a request under a new

attorneys' fees statute for work conducted entirely *before* the statute was enacted—did not affect "substantive obligations." *See id.* at 640, 105 S.Ct. at 1561. *A fortiori*, Campbell's claim for interest *following* the effective date of the FCIA does not implicate "substantive obligations" deriving from pre-enactment conduct within the meaning of *Bennett*.

easier route of having the rate "reviewed and revised periodically" by the Secretary of the Treasury. S.Rep. No. 275, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S. Code Cong. & Admin.News 11, 40.

The *Litton* court supported its interpretation of the FCIA by arguing that awarding interest beginning on the effective date when the interest is keyed to some past date—the date of judgment—"makes no economic sense at all" and that Congress could not have intended such a result. *Litton,* 746 F.2d at 175. It also argued that parties would receive an "unwarranted windfall" if interest rates subsequently declined. *See id.*

Whether or not we agree with the *Litton* court's initial conclusion about the lack of economic sense, we cannot agree with the latter two conclusions. Congress, of course, set up precisely the scheme that *Litton* derided. First, the system Congress adopted routinely calls for imposition of an interest rate that is keyed to a date long past. Indeed, in cases involving judgments against the United States, the T-bill rate applied may, as a matter of course, have little relationship to the date on which interest begins to run—the filing of the transcript of judgment with the Comptroller General.[6] *See* 31 U.S.C. § 1304(b)(1)(A) (1982).

Second, Congress did not choose to impose a post-judgment interest rate that for any single judgment would "float," *i.e.,* change from month to month, week to week, or day to day, to track the rise and fall of actual interest rates in the market. Instead, Congress adopted a scheme in which, if market interest rates fell after the entry of judgment, parties entitled to interest would experience a "windfall." If the rates rose after entry of judgment, parties entitled to interest would not be compensated fully for the loss of the use of the money. Congress evidently believed that such disparities as might occur between the T-bill rate for a given judgment and the fluctuations of actual market rates were acceptable in view of the difficulties of administering a "floating" interest rate that would avoid windfalls and undercompensation.[7] We are thus unpersuaded by the government's arguments.

The only fair indication on the face of the statute that might support a purely prospective application of the FCIA's post-judgment interest provision is the fact that the effective date was delayed for a period after the date of enactment. *See* 2 N. Singer, *supra,* § 41.04, at 350. In addition, the relevant passages in the act's legislative history—passages that clearly refer to other, better-known provisions of the FCIA (which established the Court of Appeals for the Federal Circuit and the Claims Court) and only implicitly refer to the provision of the FCIA at issue here—offer some support for this position. The Senate report indicates that "[t]he delay is intended to provide time for planning the transition and for permitting the bar to become familiar with the provisions." S.Rep. No. 275, 97th Cong., 2d Sess. 32, *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 42. In addition, the sponsor of a successful amendment to the Senate bill that extended the delay date from 60 days to October 1, 1982 (six months from the ultimate date of enactment) stated:

---

6. Consider a judgment rendered against the United States on March 1, 1987. The prevailing party does not immediately pay her attorney to have a transcript of the judgment prepared and filed with the Comptroller General, because interest is available only if the government decides to appeal. The government files its notice of appeal on April 30, within the 60–day period provided under Fed.R.App.P. 4(a). Even if the prevailing party has the transcript prepared and filed the next day, May 1, interest would be computed at the March 1 T-bill rate.

7. The government also asserts that one of Congress's (unstated) purposes was to establish a scheme that was easy to administer, a goal that would be undermined if two interest rates were applied to a single judgment. Assuming that such a purpose can be deduced from the legislative history, we do not believe that imposition of one rate before the effective date and another rate afterwards would pose serious administrative problems. Indeed, in this case, because Campbell is entitled to interest only in the period beginning January 13, 1983, only one rate is applicable to the judgment.

This amendment would provide additional time for the new courts to make necessary policy, procedural, and personnel changes. It will also allow further time for the Federal court system, administrative agencies, patent holders, the practicing bar, and the business community to become more familiar with the new changes in law and procedures, and will allow greater input by affected parties into the administrative changes required by the bill. The additional time will also allow the courts to provide for a smoother transition based on greater professional and public knowledge of the changes in law.

127 Cong.Rec. 29,869 (1981) (statement of Sen. Grassley).

 We believe that these pieces of information provide a "fair" indication that the FCIA's post-judgment interest provision should *not* be applied to judgments entered before the enactment date—at least for interest accruing prior to the enactment date. To impose the FCIA interest rate during this period would unfairly burden some losing private parties whose attorneys, the Senate committee evidently believed, might not yet be aware of the change in law when the decision to withhold payment of a judgment was made. We suspect that the Senate committee's statement was concerned more with attorneys in private practice who represent losing private parties than with attorneys representing the United States—who presumably keep abreast of statutory changes affecting the United States and whose decisions to appeal "only when substantial issues of law are at stake" are not influenced by prevailing interest rates. *See* 127 Cong.Rec. 29,866 (1981). We believe, however, that the literal terms of the Senate committee report are sufficient to encompass government attorneys and thus preclude imposition of interest at the T-bill rate against the government in the period prior to the enactment date.[8]

Nevertheless, we are not persuaded that this scant indication in the statute and legislative history constitutes a "fair" indication that the FCIA should not be interpreted to impose interest at the T-bill rate in the period *following* the enactment date. The legislative history noted above indicates that, by the time of the effective date, practicing attorneys would be presumed to have knowledge of the FCIA provisions. Hence, a losing private party who had already appealed could then choose either (1) to continue the appeal and pay interest at the T-bill rate, (2) to continue the appeal but pay the judgment to avoid the T-bill rate, or (3) to discontinue the appeal and avoid the T-bill rate. This practical result comports well with the legislative purposes of discouraging losing parties from taking and conducting lengthy, frivolous appeals in order to benefit from favorable interest rates—to the financial disadvantage of legitimate prevailing parties. *See* S.Rep. No. 275, 97th Cong., 2d Sess. 11–12, *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 21–22; 127 Cong.Rec. 29,865–66 (1981).

On the other hand, in cases in which the United States has already appealed, it can pursue options (1) or (3), but may not pay judgments pending appeal. *See* 31 U.S.C. § 1304(b)(1)(A) (1982). This result also comports with the available legislative history. Although in theory the government might be unfairly burdened if it invested money in taking an appeal without knowledge of the impending FCIA provision and it could only either pay the T-bill rate or abandon the appeal (thus in effect wasting the money already invested in the appeal), payment of interest by the government is a ministerial function and is unlikely to affect the government's decision to appeal "only when substantial issues are at stake." *See* 127 Cong.Rec. 29,866 (1981) (letter from David Stockman to Sen. Dole, Dec. 3, 1981). The government's counsel conceded this point at oral argument. In

---

**8.** We note, however, that Campbell has not requested that interest at the T-bill rate be applied

before the effective date.

addition, this result would comport with the statute's purpose of compensating the plaintiff for the loss of the use of the money pending an unsuccessful appeal by the government, and it would impose no financial burden on the government. *See id.* (stating that the government would "accept as a rate of interest ... the rate normally paid by the government for Treasury bills; i.e. the cost to the Government of borrowing money"); *id.* (letter from David Stockman to Sen. Dole, Dec. 7, 1981) (stating that the T-bill rate "is not unfair to the government since it at least reflects its cost of borrowed funds"). Therefore, we do not find a "fair" indication in the statute or legislative history that the T-bill rate should not be applied to interest accruing in the period following the FCIA's effective date. And, insofar as the legislative history and purposes might support either position, it favors application of the T-bill rate in the period following the effective date. *See Bradley,* 416 U.S. at 715–16, 94 S.Ct. at 2018–19.

### 3. "Manifest Injustice"

■ *Bradley* would foreclose Campbell's interpretation of the FCIA if such a construction would result in "manifest injustice." *Bradley* sets out three factors to consider: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019; *accord In re Reynolds,* 726 F.2d at 1423. No one factor is dispositive. *City of Great Falls v. United States Dep't of Labor,* 673 F.2d 1065, 1068 (9th Cir.1982) (per curiam).

The first factor derives from Chief Justice Marshall's statement that "in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights ... are sacrificed for national purposes, ... the court must decide according to existing laws." *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103,

110, 2 L.Ed. 49; *see Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019. Here, the fact that the party adversely affected by the new law is a governmental entity makes a finding of manifest injustice less likely. *See id.* at 718, 94 S.Ct. at 2019; *In re Reynolds,* 726 F.2d at 1423; *City of Great Falls,* 673 F.2d at 1068; *United States v. Fresno Unified School Dist.,* 592 F.2d 1088, 1093–94 (9th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); *Bunch v. United States,* 548 F.2d 336, 338–39 (9th Cir.1977); *cf. Litton,* 746 F.2d at 175 (noting that suit involved private parties). In addition, although we are hard pressed to conclude that the issue of the appropriate post-judgment interest rate involves a "great national concern," this is not a case in which individual rights would be sacrificed for national purposes; the government's financial interest is implicated. On the other hand, the United States acts much like a private party in the underlying tort action. *See Brooks,* 757 F.2d at 743.

The second *Bradley* factor examines the nature of the rights affected by the proposed application of the new law. "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. As noted above, the case before us does not concern antecedent rights vesting prior to the enactment date as in *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), or *Holt v. Henley,* 232 U.S. 637, 34 S.Ct. 459, 58 L.Ed. 767 (1914). *See In re Reynolds,* 726 F.2d at 1423–24. In fact, the case before us is much like *Bradley,* in which the Court applied a new attorneys' fees statute to work conducted entirely prior to the enactment of the statute and stated:

It cannot be claimed that the publicly elected School Board had such a ["matured or unconditional"] right in the funds allocated to it by the taxpayers.

These funds were essentially held in trust for the public, and at all times the Board was subject to such conditions or instructions on the use of the funds as the public wished to make through its duly elected representatives.

*Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020.

At most, the government had an expectation that a reviewing court would hold that it is not liable for interest in the period following the effective date. *See Long v. United States Internal Revenue Serv.*, 742 F.2d 1173 (9th Cir.1984); *In re Reynolds*, 726 F.2d at 1425 (Wallace, J., concurring). At worst, the government lacks any argument concerning "retroactivity." Campbell claims interest only for liabilities arising from conduct in the period following the enactment date: the government's continued nonpayment of the judgment or, alternatively, the government's continued prosecution of the appeal after the enactment date. *See Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.*, 684 F.2d 1383, 1389 (11th Cir.1982). Therefore, the second factor weighs heavily against a finding of "manifest injustice."

Finally, the third *Bradley* factor concerns "the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2021; *see also id.* at 721, 94 S.Ct. at 2021 (noting "additional or unforeseeable obligations"). This inquiry focuses on whether the new statutory obligation, if known, would have caused the defendant to alter its conduct. *Id.; City of Great Falls*, 673 F.2d at 1069. This factor also weighs

heavily in Campbell's favor. As discussed above, the legislative history indicates, and counsel at oral argument conceded, that the government's decision to appeal is not affected by the prevailing post-judgment interest rate. Moreover, although imposition of the T-bill rate for the period *prior* to the enactment or effective dates might impose unanticipated obligations on litigants, we cannot say the same for interest accruing after the delayed effective date. Indeed, the fact that this case involves a judgment and appeal filed months after the enactment date further supports the position that the imposition of the interest at the T-bill rate after the effective date does not constitute an "unforeseeable" obligation. This fact also distinguishes our case from the cases in other jurisdictions that held that the FCIA was inapplicable to judgments entered well before the enactment date. *See supra* Part III.A. Perhaps not coincidentally, the decision in *Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820 (N.D.Cal.1982), *aff'd*, 743 F.2d 1282 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985), permitted the application of the FCIA to a judgment entered on August 6, 1982—after the enactment date and before the effective date, as in our case.

In view of the nature and identity of the parties, the nature of their rights, and the nature of the impact of the change in law on their rights, we conclude that application of the T-bill rate to the period following the effective date would not result in "manifest injustice" so as to warrant an exception to the *Bradley* presumption.[9]

---

**9.** In the preceding discussion, we have considered only the applicability of the FCIA to judgments entered against the government. In view of the public/private factors under the "manifest injustice" inquiry, it is conceivable that a different result might obtain for judgments against parties other than the United States. This issue is not before us, however, and we do not believe that different results in the two contexts, if that situation were to arise, would be inconsistent with the current statutory framework, which retains many distinctions between the interest liability of the United States and that of other parties. *Compare* 28 U.S.C. § 1961(b) (1982) *with* 31 U.S.C. § 1304(b)(1)(A) (1982).

Even if we were required to consider the effect on private parties, we believe we would reach the same conclusion. The first *Bradley* factor—the private or public nature of the parties adversely affected—would weigh against the construction of the statute advanced by Campbell. But, under the second factor, application of the FCIA would not affect any "matured or unconditional" rights. *See Litton*, 746 F.2d at 175–76 (noting that the defendant had a right to rely on accrual of interest at the state rate "at least until the effective date of the [FCIA]" and that its right to rely on that rate continued after the effective date because of a *stipulation* that provided for the state rate pending appeal). In-

## IV. SOVEREIGN IMMUNITY

 The government argues that its proposed construction of the FCIA's post-judgment interest provision is required because waivers of sovereign immunity must be strictly construed.[10] *See Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 3277–78, 77 L.Ed.2d 938 (1983); *Lehman v. Nakshian,* 453 U.S. 156, 160–61, 101 S.Ct. 2698, 2701–02, 69 L.Ed.2d 548 (1981); *United States v. Louisiana,* 446 U.S. 253, 264–65, 100 S.Ct. 1618, 1625–26, 64 L.Ed.2d 196 (1980); *United States v. Teston,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). To be sure, the literal requirements of the statute authorizing the award of interest against the government must be strictly enforced. *See Rooney v. United States,* 694 F.2d 582, 582–83 (9th Cir.1982) (denying interest against the government when the prevailing party failed to file a transcript of judgment with the Comptroller General); *see also Tongol v. Donovan,* 762 F.2d 727, 730–33 (9th Cir. 1985) (denying attorneys' fees under a new statute expressly providing for award of fees in pending cases when the case was held not to be "pending"). But the principle of sovereign immunity does not require us to resolve all doubtful questions concerning the temporal applicability of a statute in the government's favor when the literal requirements of the statute are otherwise met. *See Hill v. United States,* 571 F.2d 1098, 1102 (9th Cir.1978) (rejecting sovereign immunity argument and using a *Bradley* analysis to apply a statute that was silent on the issue of "retroactive" effect). Here Congress has expressly consented to the continuation of the government's liability for post-judgment interest. We decide only what periods the statute covers. *See Rawlings v. Heckler,* 725 F.2d 1192, 1194–95 (9th Cir.1984) (rejecting sovereign immunity argument and applying Equal Access to Justice Act to work conducted prior to the act's effective date, when the act expressly applied to pending cases but did not indicate any congressional intent to apply the act to work conducted prior to the effective date and when there was no manifest injustice in doing so under *Bradley* ).

## CONCLUSION

 We hold that, for judgments entered against the United States after the FCIA's date of enactment and before the effective date, the FCIA governs the post-judgment interest rate during the period after the effective date. Interest should be compounded under 28 U.S.C. § 1961(b) (1982). Accordingly, we reverse the decision of the lower court applying the former 4% rate and remand for determination of the appropriate T-bill rate that should be applied to Campbell's judgment.

## REVERSED and REMANDED.

WIGGINS, dissenting:

We are presented with a narrow question: does the 1982 amendment that changed the method for determining the rate of post-judgment interest apply to a judgment against the United States entered before the effective date of the amendment? The majority holds that it does for interest accruing after the effective date. I believe that Congress intended the change in the rate of interest to apply only to judgments entered on or after the effective date. The majority of courts have also reached that conclusion. As I find no sound reason to depart from that result, I respectfully dissent.

---

deed, the *Litton* court acknowledged that changes in interest rates are usually given effect on unpaid judgments. *See id.* at 175. Finally, as discussed in the text, imposition of the new rate would not constitute an unanticipated or unforeseeable obligation. Congress assumed that private parties would have knowledge of the new statute at least by the time of the delayed effective date. At that time, the private party could decide to avoid the T-bill rate either by paying the judgment pending the appeal or by paying the judgment and discontinuing the appeal.

**10.** Campbell's statement in his reply brief that the government did not raise the sovereign immunity issue below is erroneous.

Prior to October 1, 1982, 28 U.S.C. § 1961 provided for post-judgment interest in actions against parties (other than the United States) "at the rate allowed by State law." 28 U.S.C. § 2411(b) set the interest rate on judgments against the United States at four percent per year. The Federal Courts Improvement Act (FCIA), Pub.L. No. 97–164, 96 Stat. 25 (1982), was enacted on April 2, 1982, and became effective October 1, 1982, FCIA § 402, 96 Stat. at 57. It deleted section 2411(b), extended section 1961 to civil judgments against the United States, and deleted the directive to apply the state interest rate. Amended section 1961 provides:

> [I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment [the "T-bill" rate].

28 U.S.C. § 1961(a). FCIA thus brought the United States within the general interest provision and established a uniform rate of interest.

Duncan Campbell's judgment was entered before the October 1, 1982 effective date of FCIA, but he seeks interest at the T-bill rate only for interest accruing after the effective date. The majority holds he is entitled to interest at the T-bill rate. To determine the appropriate interest rate, the majority is correct that we begin with the presumption "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The majority recognizes the *Bradley* presumption may be displaced by a fair indication from the statute's language or legislative history that the statute has only prospective effect. 809 F.2d at 571; *accord Brooks v. United States,* 757 F.2d 734, 742 (5th Cir.1985);

*Litton Sys. v. American Tel. & Tel. Co.,* 746 F.2d 168, 174 (2d Cir.1984). Failing to find a fair indication that the T-bill rate should not be applied to interest accruing after the effective date on judgments entered before that date, the majority holds the *Bradley* presumption controls.

The terms of the statute, however, fairly indicate contrary Congressional intent. Section 420 of FCIA delays operation of FCIA until October 1, 1982. 28 U.S.C. § 1961 directs that interest shall be calculated "from the date of the entry of the judgment" using a formula based on the T-bill auction price "immediately prior to the date of the judgment." The T-bill rate is thus fixed to the date of entry of judgment. It is a strained reading to conclude, as the majority does, that Congress, in providing that FCIA shall not be effective before October 1, 1982 and in pegging the interest rate to the date of judgment, intended the new interest rate to apply to judgments entered before the effective date. The conjunction of these provisions fairly indicates that Congress expected the new formula to apply only to judgments entered on or after the October 1, 1982 effective date of the statute. A majority of circuit and district courts agree with this interpretation. *See Brooks,* 757 F.2d at 742; *Litton,* 746 F.2d at 174; *United States ex rel. Billows Elec. Supply Co. v. E.J.T. Constr. Co.,* 557 F.Supp. 514, 516 (E.D.Pa.1983), *aff'd mem.,* 729 F.2d 1450 (3d Cir.1984); *Peterson v. Crown Fin. Corp.,* 553 F.Supp. 114, 116–17 n. 4 (E.D. Pa.1982); *see also United States v. Dollar Rent A Car Sys.,* 712 F.2d 938, 940 n. 5 (4th Cir.1983) (affirming post-judgment interest award at former section 1961 rate, noting parties did not dispute whether to apply the T-bill rate). *But see Handgards, Inc. v. Ethicon, Inc.,* 552 F.Supp. 820, 821 (N.D.Cal.1982) (awarding without discussion interest at the T-bill rate on a judgment entered before October 1, 1982 on interest accruing on or after October 1, 1982), *aff'd on other grounds,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985);

*cf. R.W.T. v. Dalton,* 712 F.2d 1225, 1235 (8th Cir.), (awarding interest at the T-bill rate on a judgment entered before October 1, 1982 from the date of entry of the judgment) *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Further, during the interim period between the enactment and the effective date of FCIA, the Administrative Office of the United States Courts concluded that the amended procedures would apply only to judgments entered on or after October 1, 1982. *See Brooks,* 757 F.2d at 742. While the views of the Administrative Office are not entitled to the deference of an administrative agency charged with administering a statute, its opinion indicates the practice of federal courts in implementing the transition of the amendments to FCIA. *Id.*

The majority's approach will increase the burden on the district courts in implementing the new interest rate formula. Congress was concerned with easing administration of the 1982 amendment. *See* S.Rep. No. 275, 97th Cong., 2d Sess. 32, *reprinted* in 1982 U.S.Code Cong. & Admin.News 11, 42 (FCIA took effect sixty days after enactment "to provide time for planning the transition and for permitting the bar to become familiar with the provisions"). The new calculation method changed the formula for calculating interest, and tied that formula to the date of judgment. *Litton,* 746 F.2d at 168. If the new formula were applied only to judgments entered on or after the effective date, the district courts would more uniformly and easily apply the new formula, and litigants would have an opportunity to become familiarized with the new operative rules. The majority's opinion will increase the administrative burden on the district courts, saddling them with reopening settled judgments and with determining complex changes in T-bill rates pegged to the varying dates of entry of judgment.

The majority is correct that the federal courts generally construe statutes raising interest rates on judgments to increase the post-judgment interest accruing on all unpaid judgments. *See Morley v. Lake Shore & Mich. S. Ry. Co.,* 146 U.S. 162, 168, 13 S.Ct. 54, 56, 36 L.Ed. 925 (1892); *Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.,* 684 F.2d 1383, 1388–89 (11th Cir.1982). However, section 1961 did not simply increase the interest rate; it established an entirely different calculation method tied to the judgment date. *Litton,* 746 F.2d at 175. Applying the T-bill formula to thousands of judgments entered on different dates and therefore at different rates is vastly more complex than raising the interest rate uniformly on all pending judgments. Also, the language of the statute indicates contrary congressional intent.

In light of the statutory language and legislative history of section 1961, the weight of judicial authority, the opinion of the Administrative Office, and the benefit to the courts and to litigants of certain and easily administered rules, I believe that amended section 1961 does not apply to judgments entered before its effective date.